Rachel Mariner, NV Bar No. 16728
Jason Kuller, NV Bar No. 12244
**RAFII & ASSOCIATES, P.C.**
1120 N. Town Center Dr., Ste. 130
Las Vegas, Nevada 89144
Phone: 725.245.6056
Fax: 725.220.1802
rachel@rafiilaw.com
jason@rafiilaw.com
*Attorneys for Plaintiff*

RAFII & ASSOCIATES, P.C.
EXCELLENCE | COMMITMENT | RESULTS

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| RUBEN MAYA, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>CARMAX AUTO SUPERSTORES, INC. and DOES 1 through 50, inclusive,<br><br>Defendants. | Case No.: 2:24−cv−02388−GMN−NJK<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO COMPEL ARBITRATION, STAY PROCEEDINGS PENDING ARBITRATION AND AWARD DEFENDANTS' ATTORNEYS FEES/COSTS** |

Plaintiff Ruben Maya ("Plaintiff"), by and through his attorneys, submits the following Opposition to Defendant's Motion to Compel Arbitration, Stay Proceedings and for Attorneys' Fees ("Motion to Compel" or "Motion"). Plaintiff moves the Court to find that Defendants' Dispute Resolution Agreement ("DRA") failed for lack of meeting of the minds, for unconscionability, for contravention of Defendants' implied warranty of good faith and fair dealing, and because the FAA cannot pre-empt Mr. Maya's right to a collective resolution under the FLSA. If this Court does find that the DRA requires arbitration, Plaintiff, in the alternative and for the same reasons, asks this Court to strike Rule 9(f)(ii) of the absent Dispute Resolution Rules and Procedures ("DRRP").

## MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

CarMax forced Mr. Maya to sign its arbitration agreement under pre-hiring circumstances of "significant oppression." *Ronderos v USF Redaway* 114 F. 4th 1080, 1094 (9th Cir. 2024) (finding a pre-hiring forced agreement procedurally and substantively unconscionable and refusing to enforce the agreement in its entirety). The dense, two-page Dispute Resolution Agreement ("DRA") made no mention of a class and collective action waiver and unconscionably created the obvious fiction that Mr. Maya had time to request and consider the blurry fourteen pages of mimeographed rules - the Dispute Resolution Rules and Procedures ("DRRP") that did *not* accompany the DRA when Mr. Maya signed.

If the fourteen illegible pages *had been* provided, Mr. Maya would have required considerably longer than the time he had – two and a half minutes -- to puzzle through six and a half of fourteen blurry pages. Maya Decl. ¶ 23. Then he would find Rule 9, entitled "Hearing Procedure". Rule 9 goes on for almost two pages. If Mr. Maya made it to subsection (f) (mysteriously entitled "Consolidation") he would have found two sub-parts to "Consolidation": Part (i) is "Claims", Part (ii) is "Parties". Only under "Parties" would he find out that he was not entitled to bring a class or collective action. The purported class and collective action waiver is *buried halfway through a document that was never provided and is intentionally mislabeled twice*. In order to cover their tracks, CarMax put in the DRA "[b]y consenting to this document you acknowledge receipt of the Dispute Resolution Rules and Procedures." Ex. E to Maya Decl. Pure fiction and bad faith.

CarMax hid the class and collective action waiver **six times**: (i) not providing the DRRP to Mr. Maya; (ii) when providing the DRRP to Mr. Maya's counsel, providing an illegible copy; (iii) hiding the class and collective action waiver by mislabeling Rule 9 "Hearing Procedure"; (iv) hiding the class and collective action waiver by mislabeling part (f) of Rule 9 "Consolidation"; (v) hiding the class and collective action waiver by mislabeling part (ii) of part (f) of Rule 9 "Parties"; (vi) covering their tracks by fraudulent language in the DRA CarMax knew to be false. In these circumstances, (i) there cannot be a meeting of the minds as to the class and collective action waiver because those waivers were unknowable by Mr. Maya; (ii) the circumstances of signature coupled with the oppressive nature of the DRRP makes the agreement unconscionable; (iii) enforcement of

the class and collective action waiver contravenes CarMax's implied warranty of good faith and fair dealing because it contravenes the stated intent of the arbitration agreement; (iv) the FAA cannot preempt the sole legislative purpose of the FLSA – collective protection of American workers.

## II. STANDARD OF REVIEW

"[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Raebel v. Tesla, Inc.,* 451 F.Supp.3d 1183, 1189 (D.Nev. 2020) (*citations omitted)* A court must not doom an employee to the black hole[1] of arbitration if there is not a valid arbitration agreement or if the agreement does not encompass the dispute at issue.

Plaintiff has the burden to establish the fatal issues in contract formation, a failure of meeting of the minds, unconscionability and breach of the implied covenant of good faith and fair dealing. He gladly bears this burden. Importantly, because the motion to compel arbitration "standard mirrors the summary judgment standard, the [c]ourt views all of the facts and draws all inferences *in favor of the party opposing arbitration*." *Massaad v. CVS Rx Services*, 2017 WL 4271854, *6 (N.D. Ohio) (denying a motion to compel arbitration); *Hanson v. MLB Mortgage Services Inc.* 1 F.4th 667, 670 (9th Cir. 2021) ("[T]he summary judgment standard is appropriate …") (citations omitted). Thus, in determining the circumstances of formation, unconscionability and the breach of the implied warranty of good faith and fair dealing, the facts and inferences set forth herein must be viewed favorably to Mr. Maya.[2]

---

[1] *See infra* n. 11.

[2] CarMax incorrectly states the legal standard under which Mr. Maya's claims must be considered. CarMax cites a forty-year-old case, *Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985): "By its terms, the [Federal Arbitration Act] leaves no place for the exercise of discretion by a district court, but instead mandates that district courts shall direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." Def.'s Mot. Comp. at 7. In truth, the authority of this Court is not nearly as kneecapped by corporate America as CarMax wishes. The standard from the Supreme Court more correctly comes from *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63 (2010). After noting that elements of arbitration agreements are not "unassailable," the Court held that "[i]f a party challenges (footnote continued)



RAFII & ASSOCIATES, P.C.
EXCELLENCE | COMMITMENT | RESULTS

RAFII & ASSOCIATES, P.C.
EXCELLENCE | COMMITMENT | RESULTS

## III. SUMMARY OF ARGUMENT

First, Mr. Maya signed CarMax's DRA – the two-page agreement - but never saw the illegible 14-page Dispute Resolution Rules and Procedures ("DRRP") until litigation commenced. The class and collective action waiver which CarMax seeks to impose on Mr. Maya was intentionally hidden by CarMax in multiple ways, and CarMax attempted to protect itself by contractual language imposing a hide-and-seek game on the victim. Any contract that may have been formed by Mr. Maya signing the DRA cannot include the DRRP – and therefore cannot include a class and collective action waiver because there is no meeting of the minds.

Second, of the dozen cases provided by CarMax for the proposition that its DRA and DRRP are valid and enforceable, only *one* of the courts actually found that to be the case. Every other court that wrote an opinion found troubling aspects of procedural and substantive unconscionability. In light of the newer cases *Osterhaus v CVS Health Corporation* 2024 WL 4785818 (D. Ariz.), *F.Q. Gentlemen's Club, Inc. v. Doe Dancers I* 136 Nev. 809, 2020 WL 5587435 (unpublished disposition cited for persuasive value) and *Ronderos v USF Redaway* 114 F. 4th 1080, 1094 (9th Cir. 2024) this Court should join its sister court, the Ninth Circuit and the Nevada Supreme Court in finding Mr. Maya's circumstances procedurally unconscionable and the DRRP riddled with substantive unconscionability.

Third, separately from any unconscionability analysis, application of the class and collective action waiver in the DRRP contravenes the strong Nevada implied warranty of good faith and fair dealing in every contract. CarMax's duty of good faith in the DRA requires "fair" and "economical" dispute resolution for Mr. Maya that preserves his "full freedom of association".

---

the validity under § 2 [of the FAA] of the precise agreement to arbitrate at issue, the federal court must consider the challenge before ordering compliance with that agreement under § 4." Rent-A-Ctr. 561 U.S. at 71. Since the Supreme Court has said that the "federal court *must* consider the challenge" to formation and enforcement of an arbitration agreement, it seems unreasonable to sanction the plaintiff who seeks that consideration. (emphasis supplied). *See further infra §V.E.*

Therefore, the class and collective action waiver must be severed from the agreement, as per the reasoning in *Casas v. CarMax Auto Superstores California, LLC*, 224 Cal. App. 4th 1233 (2014) and *Etokie v. CarMax Auto Superstores* 133 F. Supp. 2d 390, 395 (D. Md. 2000).

Mr. Maya's fourth argument is based on the court's challenge in Lucini *v CarMax,* 2012 WL 3862150, *6 (E.D. Cal.). The *Lucini* court held that the "FLSA does not override the strong FAA policy to enforce arbitration agreements" because

> Plaintiff "points to *no suggestion* in the text, legislative history, or purpose of the FLSA that Congress intended to confer a nonwaivable right to a class action under that statute. His inability to bring a class action, therefore, cannot by itself suffice to defeat the strong congressional preference for an arbitral forum"

*Id.* (emphasis supplied). Mr. Maya argues herein that the FLSA *does* override the FAA because he can, unlike Mr. Lucini*,* point to text, legislative history and the purpose of the FLSA to prove that Congress intended to confer a nonwaivable right to a collective action in the FLSA and that Congress had *no appetite* to send employees to an arbitral forum[3].

The overarching question in all unconscionability cases is "whether the terms of the contract are sufficiently unfair, in view of all relevant circumstances, that a court should withhold enforcement." *Ronderos* at 1089. In this action, they are.

## IV. ALL RELEVANT CIRCUMSTANCES

### A. Mr. Maya's Onboarding Experience

A week after Mr. Maya applied via on-line job board for a mechanic job at CarMax, on February 29, 2016, he was brought in for a tour of the facilities, an interview, and to sign four documents before he could be considered for the job. Maya Decl. ¶ 4-14. He drove to CarMax from his current job and back during his lunch hour; he estimates he was at the CarMax facility for about

[3] Finally, Mr. Maya argues that Defendants seeking an award of attorneys' fees against his counsel for challenging the arbitration agreement is, like much of the DRRP, in bad faith and without justification.



RAFII & ASSOCIATES, P.C.
EXCELLENCE | COMMITMENT | RESULTS

RAFII & ASSOCIATES, P.C.
EXCELLENCE | COMMITMENT | RESULTS

thirty minutes. For twenty minutes, he toured the facilities and heard about the auto technician job. For the last ten minutes, he was asked to sign four documents. Maya Decl. ¶ 4-5. If the amount of time spent on the documents was equal, that was two and a half minute each.

The four documents were: (1) “Consumer Report Authorization” (1 page); (2) “Employment Application Summary” (3 pages); (3) “Driver Safety Evaluation Form” (1 page, countersigned by CarMax employee contemporaneously) and (4) “CarMax Dispute Resolution Agreement” (“DRA”) (2 pages). Maya Decl. ¶ 8-15 (the “Leap Day Documents”). All the Leap Day documents signed on February 29, 2016 were similar in font and resolution and many have a blue heading. *Id.*

The DRA recites that “[b]y consenting to this document you acknowledge receipt of the Dispute Resolution Rules and Procedures” (“DRRP”). DRA, p. 2 ¶ 1. Weirdly, it also requires Mr. Maya to “request a copy” of the DRRP if it was not provided. DRA p. 1 ¶ 1. Having these competing clauses in the DRA demonstrates that the lack of the DRRP is intentional and CarMax’s strategy in hiding the DRRP is to blame the employees who didn’t follow up on the fine print in the two and half minutes they had – even though following up would mean they would not get the job. Taking the facts in the light most favorably to Mr. Maya, the Dispute Resolution Rules and Procedures were not present when Mr. Maya signed.

When CarMax provided employment records to Plaintiff’s Counsel in this case, however, a copy of the DRRP was produced. It is attached to the Maya Declaration as Exhibit E. It is very different from the other Leap Day documents. It is in a different font, a difficult-to-read bold. It is shaded to the point of illegibility. It requires no signature. *Id.* It has no blue header and it doesn’t have Mr. Maya’s name, like the Leap Day Documents. Finally, this DRRP is *strikingly* different to the much more legible copies CarMax produced to the Court. Def.’s Mot. Comp. Ex. B.

Because Mr. Maya did not receive the DRRP that day, he couldn’t have known that he was

waiving his right to participate in a class or collective action. There could be no meeting of the minds. And if Mr. Maya did receive that document that day, which he denies, he would have had to work his way through the blurry nearly illegible text into page 6 to Rule 9, "Hearing Procedure". Once he got to Hearing Procedure, he could go to part "f" of Rule 9 entitled "Consolidation" (a meaningless confusing title) on the next page. The second part of Rule 9(f) is titled "ii. Parties". If he made it to the second line of Rule 9 (f)(ii) he would find out that an arbitrator would not have the power to hear a class or collective action. That is a long way to travel on a document that didn't even cross his path. He wasn't warned.

### B. The Unconscionable Clauses in the DRRP:

Besides the class/collective action waiver, two other clauses of the DRRP are substantively oppressive. Taken together, they permeate the DRRP with "unconscionable taint". *See CarMax Auto Superstores California, LLC v. Hernandez*, 94 F. Supp. 3d 1078, 1124 (E.D. Cal. 2015) (The *Hernandez* court removed the taint by excising one clause; here there are three.)

#### a. Confidentiality Clause

Rule 9 of the Dispute Resolution Rules and Procedures, dubiously titled "Hearing Procedure" has, buried after the prohibition of class and collective arbitration in Rule 9(f) a confidentiality clause:

> All aspects of an arbitration pursuant to these Dispute Resolution Rules and Procedures, including the hearing and record of the proceeding, shall be confidential and shall not be open to the public, except (i)to the extent both Parties agree otherwise in writing; (ii) as may be appropriate in any subsequent proceeding between the Parties, or (iii) as may otherwise be appropriate in response to a governmental agency or legal process. All settlement negotiations, mediations, and the results thereof shall be confidential….

This clause is unconscionable in creating a "repeat player" advantage for CarMax over its employees.[4]

---

[4] *See Sanchez v. CarMax Auto Superstores California, LLC*, 224 Cal. App. 4th 398, 402 (2014) (finding the confidentiality clause has a substantively unconscionable interpretation) In *Osterhaus v CVS Health Corporation* 2024 WL 4785818 (D. Ariz.), Judge Tuchi explained the substantive

(footnote continued)



RAFII & ASSOCIATES, P.C.
EXCELLENCE | COMMITMENT | RESULTS

**Rule 13 CarMax's Unilateral Right to Edit The Agreement**

Under Rule 13 of the DRRP, CarMax has the unilateral right to modify the agreement which courts cited *infra* have held unconscionable. Under *Casas v. CarMax Auto Superstores California, LLC*, 224 Cal. App. 4th 1233, 1237 (2014), Rule 13 is only permissible because CarMax's implied warranty of good faith and fair dealing prevents them from using Rule 13 contrary to the intention of the agreement: "fair" and "economical" resolution with less adversity than a court proceeding. If that warranty is not enforced, Rule 13 is unconscionable.

**C. The Business Realities of Wage Theft and Arbitration Agreements:**

In *Ronderos v USF Redaway* 114 F. 4th 1080, 1094 (2024), the Ninth Circuit admonished that "the party seeking to enforce a one-sided term must provide at least some reasonable justification for such one-sidedness based on 'business realities" (citations omitted). No such justification is possible. CarMax has 239 locations across the United States and four in Nevada. www.Carmax.com/about-us. CarMax states it has 30,000 employees or roughly 126 people per location. *Id.* If one makes a (very conservative) assumption that twenty-five people at each location are auto technicians and there are a further twenty-five ex-auto technicians per location then there are 200 collective members in Nevada. For himself and those 200 putative collective members, Mr. Maya alleges wage theft in the amount of $280,800.[5] On a national basis that is $24.5 million, before being doubled for penalty. At $1400 per person, this is a significant amount for an hourly worker but comfortably less than the $32 million dollars CarMax paid its *five* C-Suite executives

concern through an analysis of *Ting v. AT&T*, 319 F.3d 1126, 1152 (9th Cir. 2003). He reasoned that when a defendant is in a "far superior legal posture" by "ensuring that none of its potential opponents have access to precedent", they are able to "accumulates a wealth of knowledge on how to negotiate the terms of its own unilaterally crafted contract. The arbitration agreement was set aside as unenforceable. *Id.* at * 15 (citing *Ting* at 1152. *accord Davis v. O'Melveny & Myers*, 485 F.3d 1066, 1078 (9th Cir. 2007)).

5 Seventy-eight pay periods (26 per year for the FLSA three-year statute of limitations (29 U.S.C, §255) multiplied by 200 employees multiplied by $18 (average overtime violation per pay period). This is before being doubled by the statutory penalty. 29 U.S.C. § 216.

last year[6] Taken in the light most favorable to Mr. Maya, the complaint alleges that wage theft contributes to CarMax's $25 billion annual revenue[7]. This a business reality[8].

Second, real data shows an overwhelming correlation of wage theft to the enforcement of mandatory arbitration agreements.[9] Since 2014, the epidemic of wage theft has cost American hourly worker $50 billion a year – or half a trillion dollars.[10] This is because in the absence of collective actions – the unique FLSA remedy - workers do not bring FLSA claims. Those claims fall into a black hole.[11] Without a collective, there is not FLSA enforcement, and thus, now, "the *claim-suppressive effects of forced arbitration have eliminated up to ninety-eight percent of all employment claims and virtually insulated employers from liability altogether*." *Harv. L. Rev., supra* n. 6, at 1652.

The FLSA was born when a ten-year-old seamstress tried to pass a note to President Franklin Roosevelt while he was campaigning for reelection:

> But a policeman threw her back into the crowd. Roosevelt told an aide, "Get the note from the girl." Her note read, "I wish you could do something to help us girls....We have been working in a sewing factory... and up to a few months ago we were getting our minimum pay of $11 a week... Today the 200 of us girls have been cut down to $4 and $5 and $6 a week. To a reporter's question, the President replied, "Something has to be done about the elimination of child labor and long hours and starvation wages."

Franklin D. Roosevelt, *Public Papers and Addresses*, Vol. V New York, Random House, 1936), pp.

---

[6] CarMax, *Notice of Annual Meeting of Shareholders and Proxy Statement* pp. 36,48 and 41

[7] https://www.macrotrends.net/stocks/charts/KMX/carmax/revenue.

[8] Mr. Ruben also has claims for failure to pay overtime and waiting time wages under Nevada Law brought as Rule 23 class actions. Since the Court's jurisdiction is federal question concerning the FLSA, Plaintiff concentrates his arguments there, but all his arguments equally apply to his state las claims.

[9] *The Enforcement Opportunity: From Mass Arbitration to Mass Organizing*, 136 Harv. L.Rev. 1652 (

[10] Bradley Meixell and Ross Eisenbrey, *An Epidemic of Wage Theft Is Costing Workers Hundreds of Millions of Dollars a Year.* (Economic Policy Institute Report September 11, 2014)

[11] Cynthia Estlund, *The Black Hole of Mandatory Arbitration,* 96 UNC Law Review 679, 695 (2018). Estlund undertakes an exhaustive analysis of data sets concerning arbitration and concludes the 'black hole' of arbitration is the employee plaintiffs simply do not file their FLSA and other claims when they can't go to court. There are myriad reasons for this, but the black hole is that there are *98% fewer employee arbitrations* that the data predicts there should be. *See also* Alexander J.S. Colvin, *The Growing Use of Mandatory Arbitration,* Economic Policy Institute Report (2017) (epi.org) ("Given the finding that 60.1 million American workers are now subject to these [arbitration] procedures, this means that only 1 in 32,000 employees subject to these procedures actually files a claim under them each year. These findings indicate that employers adopting mandatory employment arbitration have been successful in coming up with a mechanism that effectively reduces their chance of being subject to any liability for employment law violations to very low levels.")



RAFII & ASSOCIATES, P.C.
EXCELLENCE | COMMITMENT | RESULTS

624-25. The collective element is the only way that the FLSA makes sense – "200 of us girls" -- it was in the very first draft of that law considered the cornerstone of the New Deal.[12] The purpose of the FLSA was to allow employees to "leverage group power rather than being forced to confront the employer as individuals."[13]

When a collective is prohibited in arbitration, the worker is deprived of the protection of the Fair Labor Standards Act. The data proving the proposition is impossible to ignore. *See Estlund, supra* n.11. There is strong legislative history that the FLSA was meant to function as a collective.[14] And the FAA wasn't written thirteen years before the FLSA to preempt the FLSA collective action, it was written to facilitate business-to-business dispute resolution and no one dreamed, under the understanding that everyone had of the commerce clause in 1925 and 1938, that a federal business to business law could ever apply to an employee and especially a quotidian situation of a Nevada resident working at a Nevada garage on cars that will be sold in Nevada.[15] The line of cases

---

[12] https://www.dol.gov/general/aboutdol/history/flsa1938

[13] *See* Marion Crane, Pauline T. Kim, *A Holistic Approach To Teaching Work Law*, 58 St. Louis L.J 6 (2013) *(*"When we put the class and collective action claims from employment discrimination and employment law together with the labor law perspective, we can begin to see them all as a piece of the same conflict—a struggle over workers' ability to leverage group power rather than being forced to confront the employer as individuals.")

[14] John S. Forsythe, *Legislative History of the Fair Labor Standards Act*, 6 Law & Contemporary Problems 464, 465-66, 484 (1939) (scholarship.law.duke.edu) ("The President's message to Congress asserted the necessity for governmental control over maximum hours, minimum wages, the evil of child labor and *the exploitation of unorganized labor*). *See also Hoffman-LaRoche v Sperling,* 493 U.S. 165, 173 (1989) ("In 1938, Congress gave employees and their "representatives" the right to bring actions to recover amounts due under the FLSA.")

[15] *See* Federal Arbitration Act of 1925, 9 U.S.C. § 1 (2000); Margaret L. Moses, *Arbitration of Worker Contracts: New Prime's Proper Statutory Interpretation of the 1925 Federal Arbitration Act, ,* 21 Cardozo J. Conflict Resol. 415 (2020) (arguing that the FAA does not on its own extend to contracts of employment and that the Supreme Court is ready to revisit the mistaken judicial activism that so extended the FAA against its plain meaning); Samuel Estreicher, *Predispute to Agreement to Arbitrate Statutory Employment Claims*, 72 N.Y.U. L. Rev. 1344, 1363-72 (1997) (criticizing the Court for supporting the enforcement of mandatory arbitration agreements required of workers in view of the language of 9 U.S.C. § 1, which states that the Act's power of specific enforcement of predispute arbitration agreement does not extend to a "contract of employment"); Matthew W. Finkin, *Employment Contracts Under the FAA -Reconsider*ed, 48 LABOR L. J. 329, 330 (1997) ("Proponents [of the FAA] were pressing a commercial arbitration law wholly unconcerned with employment" and "when an objection was raised to the legislation by labor organizations, which wanted to ensure that workers' contracts were not covered by the bill, their concern was swiftly … removed by the simple expedient of the exemption.")*;* Matthew W. Finkin, *"Workers' Contracts" Under the United States Arbitration Act: An Essay in*

(footnote continued)





RAFII & ASSOCIATES, P.C.
EXCELLENCE | COMMITMENT | RESULTS

allowing the FAA to pre-empt FLSA collective actions "have engendered uniquely broad consensus about their incorrectness.". George A. Berman, *State Courts and the Federalization of Arbitration Law*, 134 Harv. L. Rev. 1184, 1198 (2021). They cannot be followed here.

## V. ARGUMENT

### A. CarMax Cannot Prove A Meeting of the Minds On The Class and Collective Waiver

Mr. Maya denies ever seeing the Dispute Resolution Rules and Procedures. That ground alone creates a genuine issue of fact surrounding the purported agreement to arbitrate, and Plaintiff submits this Court cannot compel arbitration. *See Metter v Uber Technologies,* 2017 WL 1374579 (N.D. Cal.) (because the Uber app functionally prevented plaintiff from seeing the terms of service alert, there was a genuine dispute as to whether he received inquiry notice of and assented to those term). To be clear, Mr. Maya is contending that the Dispute Resolution Rules and Procedures were not presented to him, no one at CarMax on Leap Day (or after) said anything to him about the Dispute Resolution Rules and Procedures, and none of his training included any explanation of the arbitration agreement[16]. An agreement to arbitrate is sufficiently knowing when "(1) [the employee] was provided with an acknowledgement form that 'explicitly notified' him the employee manual contained a dispute resolution policy; (2) he signed the acknowledgement form; (3) the underlying policy was made available to him") *Newbill v CVS Caremark*, 683 F. Supp.3d 1004, 1008 (D. Ariz. 2023).

---

*Historical Clarification*, 17 Berkeley J. of Emp. & Lab. L. 282, 296 (1996) ("This law concerned disputes between growers, packing houses, and shippers, but was unconcerned with employment contracts"); Jeffrey W. Stempel, *Reconsidering the Employment Contract Exclusion in Section 1 of the Federal Arbitration Act: Correcting the Judiciary's Failure of Statutory Vision*, 1991 J. Disp. Resol. 259, 263-79 (same); Jeremy Kennedy, Comment, *The Supreme Court Swallows a Legal Fly: Consequences for Employees as the Scope of the Federal Arbitration Act Expands*, 33 Tex. Tech L. Rev. 1137, 1153-64 (2002) (same). If Congress assumed that the FAA covered employment agreements, why did it carve out employment agreements in interstate commerce? The only way the exemptions make sense is if they are interpreted in alignment with the legislative history: ensuring NO employment agreements are covered

[16] CarMax can point to no training course or discussion to ensure a meeting of the minds. *Cf. Macias v Oklahoma CVS Pharmacy LLC*, 2024 WL 4508581 *4 (W.D. Okla.) (Granting a motion to compel when CVS demonstrated plaintiffs attended an online training course which specifically explained the opt-out *in addition to* simply providing the arbitration agreement: "CVS also provided its employees with an arbitration training course intended to "communicate[ ] and educate[ ] employees on CVS's Arbitration Policy.").



RAFII & ASSOCIATES, P.C.
EXCELLENCE | COMMITMENT | RESULTS

RAFII & ASSOCIATES, P.C.
EXCELLENCE | COMMITMENT | RESULTS

Unlike *Newbill,* the underlying policy was not made available to Mr. Maya and so there can be no meeting of the minds as to the clauses hidden in the Dispute Resolution Rules and Procedures. If Defendants could somehow prove that the Dispute Resolution Rules and Procedures were available to Mr. Maya, it would make no difference. Essential terms like the inability to participate in class or collective actions cannot be hidden away and mislabeled to escape detection. Nor can Defendants rely on the ludicrous clause in the DRA requiring Mr. Maya to "request a copy" of the DRRP if it is not provided to show that the third prong of *Newbill* is met. It is too obviously a one-sided fiction.

Under the Federal Arbitration Act, an agreement to arbitrate is enforceable "save upon such grounds as exist at law or in equity for the revocation of any contract". 9 U.S.C. § 2; *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 354 (2011). In Nevada, "an enforceable arbitration agreement subject to the Federal Arbitration Act (FAA) requires offer, acceptance, meeting of the minds and consideration." *El Jen Medical Hospital, Inc. v. Tyler,* 535 P.3d 360, 664 (Nev. Sup. Ct. 2023). A meeting of the minds exists when "the parties have agreed on the contract's essential terms". *Certified Fire Prot. Inc. v. Precision Constr,* 128 Nev. 371, 378 (Nev. 2012). There was not, for Mr. Maya, a "meeting of the minds" with respect to the class action waiver, nor could there have been. For that reason alone, the Defendants' Motion to Compel must be denied.

### B. The CarMax DRRP Is Both Procedurally and Substantively Unconscionable

#### a. The DRRP Is Procedurally Unconscionable

As the 9th Circuit has recognized, there is a "degree of procedural unconscionability that is always present with an adhesive contract". *Ronderos* at 1094 citing *Pinela v. Neiman Marcus Grp., Inc*., 238 Cal. App. 4th 227, 243, 190 Cal.Rptr.3d 159 (Ct. App. 2015).[17] CarMax provides a string cite of a dozen cases for the proposition that "the same arbitration agreement" entered into by Mr.

[17] Although *Ronderos* and *Pinela* apply California law, "Nevada mirrors California in its analysis of unconscionability (*Burch v. Second Judicial District Court* (Nev. 2002) 118 Nev. 438, 49 P.3d 647, 650–651, fns. 14, 17, 18).

Maya is "valid and enforceable". Def.'s Mot. Compel at 3. A closer review of the string cite unfortunately for CarMax tells a different story. Of the dozen cases cited, half are minute orders without analysis or precedential value[18]. Five with written opinions find some element of the Dispute Resolution Rules and Procedures either substantively or procedurally unconscionable or both[19]. *One* case of the *twelve* cited finds no unconscionability in the DRRP. It discusses no particular section of the DRRP; has no factual analysis around the circumstances of signing and applies North Carolina law. *Mahmoud v. CarMax Auto Superstores, Inc.*, 2011WL 32518 (W.D.N.C.). Many other CarMax cases not cited by Defendants show courts struggling to apply the DRA and DRRP. [20]

---

[18] *Udesky v. CarMax Auto Superstores, Inc.*, Civil Case No. 2:22-cv-00546-RFB-EJY, United States District Court, District of Nevada (March 27, 2023); *Bendure v. CarMax Auto Superstores West Coast, Inc.*, Civil Case No. CIVSB2128683, Superior Court of California, County of San Bernardino (November 29, 2022); *Brittney Conley v. CarMax Auto Superstores California, LLC*, Civil Action No. 20STCV38359, Superior Court of California, County of Los Angeles (July 20, 2021); *Craig Weiss v. CarMax Auto Superstores California*, LLC, Civil Action No. SCV-36383 (November 29, 2017); *Sabanovich v. CarMax Auto Superstores Cal., LLC*, Stanislaus County Superior Court, Case No. 2027406 (May 15, 2018); *Daryl Mills v. CarMax*, Civil Action No. 3:15-cv-05018, ECF No. 25 (June 7, 2016)

[19] *See CarMax Auto Superstores California, LLC v. Hernandez*, 94 F. Supp. 3d 1078, 1124 (2015) (finding the CarMax Dispute Resolution Rules and Procedures both procedurally and substantively unconscionable and applying the agreement only after severing Rule 12 to "remove the unconscionable taint from the agreement"); *Sanchez v. CarMax Auto Superstores California, LLC*, 224 Cal. App. 4th 398, 402 (2014) ("[t]he arbitration agreement was presented to Sanchez on a take-it-or-leave-it basis, and his signature was a condition of employment with CarMax. It was therefore a standard contract of adhesion imposed and drafted by CarMax, which had superior bargaining power. As Sanchez had no real choice whether to sign, *the agreement was procedurally unconscionable*." Later, the court only hesitantly decided that the confidentiality provision of the DRRP – certainly had a substantively unconscionable interpretation but "the potentially unconscionable interpretation of the confidentiality provision does not so permeate the arbitration agreement as to render it unenforceable". *Id.* at 1112) (emphasis supplied); *Herrera v. CarMax Auto Superstores, LLC*, 2014 WL 3398363 (C.D. Cal.) ("The Court finds that the Agreement has a small degree of procedural unconscionability resulting from its "adhesive nature" and "[t]he potentially unconscionable interpretation of the confidentiality provision does not so permeate the arbitration agreement as to render it unenforceable."); *Luchini v. CarMax, Inc.,* 2012 WL 3862150, *6 (E.D. Cal.) (confirming the finding that Rule 10 of the DRRP was unconscionable and had to be severed); *Casas v. CarMax Auto Superstores California, LLC*, 224 Cal. App. 4th 1233, 1237 (2014) (finding only the employer's obligation of good faith and fair dealing saved the DRRP Rule 19 from being illusory and therefore unconscionable).

[20]. *See Landaverde v. CarMax Auto Superstores Inc.* 2024 WL 3915099 ("[b]ecause the DRA was signed by Plaintiff as a condition of employment without the opportunity for meaningful negotiation, it is to some degree procedurally unconscionable"; *Max Auto Superstores Inc.* v. *Sibley,* 767 Fed. Appx. 462 (2019) (agreement saved from unconscionability because plaintiff was attorney) *Etokie v. CarMax Auto Superstores* 133 F. Supp. 2d 390, 395 (D. Md. 2000) (holding "…Rule 14 of the arbitration agreement should be modified in accordance with Rule 18 of the agreement *to allow for the full range of remedies that Plaintiff is entitled to under the ADA and Title VII. This solution conforms to the federal policy favoring arbitration, while ensuring that Plaintiff will have the opportunity to fully vindicate his rights*.") (emphasis supplied).





RAFII & ASSOCIATES, P.C.
EXCELLENCE | COMMITMENT | RESULTS

RAFII & ASSOCIATES, P.C.
EXCELLENCE | COMMITMENT | RESULTS

Even if Mr. Maya did receive the Dispute Resolution Rules and Procedures, he can demonstrate the agreement is unconscionable and therefore unenforceable. Review of a contract must be at least theoretically possible, otherwise the *entire* arbitration agreement fails. *See Raebel v. Tesla, Inc.,* 451 F.Supp.3d 1183, 1189 (D.Nev. 2020) (citing *D.R. Horton* at 554 (quoting from *American Airlines, Inc. v. Wolens,* 513 U.S. 219, 249, 115 S. Ct. 817, 130 L.Ed.2d 715 (1995) (O'Connor, J., concurring)) While *Horton* was partially overturned *by U.S. Home Corporation v. Michael Ballesteros Trust,* 134 Nev. 180 (2018) regarding the size of the print in the arbitration clause, it is still Nevada law that "review of the contract" must be *possible* for that contract to be saved from being unconscionable. The law does not require a neon sign, Plaintiff realizes, but *Horton* requires more for Nevada employees than letting an employer kill an FLSA claim (and Rule 23 class action claims under Nevada law) with a clause triply mislabeled inside a document that is never provided.

"A clause is procedurally unconscionable when a party lacks a meaningful opportunity to agree to the clause terms either because of unequal bargaining power, as in an adhesion contract, or because the clause and its effects are not readily ascertainable upon a review of the contract." [21] A chaotic atmosphere and a lack of information provided to employees alone has been sufficient grounds for procedural unconscionability in Nevada. [22] The same chaos and misinformation in *F.Q. Men's Club* resonates in Mr. Maya's actual experience, and the parallels between Mr. Maya's experience with his contract and the Greens' experience with theirs is remarkable:

(a) *Difficult to Read* "The contracts Horton presented to the Homebuyers were difficult to read and the arbitration clause was on the back page." *Horton* at 556. The copy allegedly provided to Mr. Maya is illegible, and the class action waiver was hidden in a mislabeled rule.

---

[22] *FQ Men's Club, Inc. v. Doe Dancers I* 136 Nev. 809, 2020 WL 5587435 (unpublished disposition cited for persuasive value). In *FQ Men's Club*, the Nevada Supreme Court affirmed the circuit court's decision that the chaotic atmosphere under which the dancers were asked to sign the agreement coupled with the lack of information about the meaning of the agreement rendered it procedurally unconscionable. * 4.

(b) *Signature Not Near Provision; Provision Inconspicuous*: "The signature lines, in contrast, were on the front page. Other than the fact that the paragraph headings relating to the arbitration provision were in bold capital letters, just like every other heading in the contracts, nothing drew attention to the arbitration provision …. As in *Burch* (*infra n*.11*)* the arbitration provision was inconspicuous." *Id.* The document Mr. Maya signed was not the document that even had the class action waiver.

(c) *Nothing warned the signer what he was giving up:* "Thus, even if an individual read the contract, there was nothing to draw the reader's attention to the importance of the arbitration provision. This failure to highlight the arbitration agreement, together with the representations made by Horton's agent that these were standard provisions, are key features in the district court's finding of procedural unconscionability." *Id.* Mr. Maya remembers discussing the Driver Safety Evaluation form with the CarMax employee. There was no discussion about the arbitration agreement. Maya Decl. at 15.

*D.R. Horton Inc. v. Green,* 120 Nev. 549, 554 (2004) This creates "no real negotiation and an absence of meaningful choice" *Jackson v. S.A.W. Entertainment Ltd*, 629 F.Supp.2d 1018 (9th Cir. 2018) (ruling the entire agreement unenforceable for this procedural unconscionability and the substantive unconscionability of the class action waiver).

In *Ronderos* the 9th Circuit reiterated the standard:

> The circumstances relevant to establishing oppression include, but are not limited to (1) the amount of time the party is given to consider the proposed contract; (2) the amount and type of pressure exerted on the party to sign the proposed contract; (3) the length of the proposed contract and the length and complexity of the challenged provision; (4) the education and experience of the party; and (5) whether the party's review of the proposed contract was aided by an attorney.

*Id.* at 1090. Mr. Maya had two and a half minutes to read a two-page agreement and (theoretically) a fourteen-page addendum. If he didn't sign it, he didn't get the job. Mr. Maya is a gifted and astute auto mechanic with a high school education. He is not an attorney and he was not aided by one. *Ronderos,* and the cases leading up to it, found significant employer oppression and unconscionability





RAFII & ASSOCIATES, P.C.
EXCELLENCE | COMMITMENT | RESULTS

in those circumstances: signing is a condition of employment and there is no actual opportunity to consult an attorney.[23] Mr. Maya has demonstrated the same circumstances.

In *Ronderos* mislabeling and confusing drafting injected so much uncertainty into the agreement that it became unconscionable. As with the DRRP, the agreement was "difficult (even for a lawyer) to figure out". *Id.* The Ninth Circuit cited *Pinela v. Neiman Marcus Grp., Inc.*, 238 Cal. App. 4th 227, 243, 190 Cal.Rptr.3d 159 (Ct. App. 2015) for the proposition that a delegation clause coupled with a choice of law of the FAA created procedural unconscionability because "it was highly unlikely that a "layperson" would understand how arbitrability questions would be resolved under the agreement" *Id.* The circumstances of *Pinela* obtain here for every CarMax auto mechanic trying to find the class and collective action waiver:

> Grasping the import and meaning of this particular delegation clause would have been beyond the ken of most anyone in these rushed circumstances. Without going to the expense of hiring a lawyer … and then having sufficient time to seek and obtain legal advice from that lawyer, Pinela was not in a position to make an informed assessment of the consequences of agreeing to delegate all questions concerning the "applicability, meaning, scope [or] enforceability" of the Agreement to the arbitrator. Although the delegation clause was not hidden from him, it might as well have been.

*Id.* at 173-174. Hearing Procedure; Consolidation; Parties. Those are not subtitles, they are obfuscations that cannot be rewarded by enforcement.

---

[23] *Ronderos* at 1090-1091: "courts have found significant oppression based on similar circumstances in both pre-and post-hiring settings. *See, e.g., Ali v. Daylight Transp., LLC*, 59 Cal.App.5th 462, 273 Cal. Rptr. 3d 544, 554 (2020) (finding "significant oppression" when employer required employees to sign agreements as a condition of employment without an opportunity to consult an attorney); *Baxter v. Genworth N. Am. Corp.*, 16 Cal.App.5th 713, 224 Cal. Rptr. 3d 556, 565 (2017) (*declined to follow on other grounds by Ramirez v. Charter Commc'ns, Inc.*, 16 Cal.5th 478, 322 Cal.Rptr.3d 825, 551 P.3d 520 (2024) (finding high degree of oppression when employer presented agreement as a condition of continued employment on a take-it-or-leave-it basis, and employee lacked equal bargaining power)."



RAFII & ASSOCIATES, P.C.
EXCELLENCE | COMMITMENT | RESULTS

RAFII & ASSOCIATES, P.C.
EXCELLENCE | COMMITMENT | RESULTS

**b. The Class and Collective Action Waiver Is Substantively Unconscionable.**

Mr. Maya's circumstances also render the class and collective action waiver substantively unconscionable. In *F.Q. Men's Club, Inc. v. Doe Dancers I* 136 Nev. 809, 2020 WL 5587435, the Nevada Supreme Court allowed employees to proceed in a class action because the arbitration agreement they signed was procedurally and substantively unconscionable. As to substantive unconscionability the Nevada Supreme Court stated:

> the substantive "unconscionability doctrine is concerned not with a simple old-fashioned bad bargain but with terms that are unreasonably favorable to the more powerful party" Thus, to determine substantive unconscionability, the focus is on "oppressive terms. … , we … conclude that the district court's findings support a determination that the Dancers "lack[ed] a meaningful opportunity to agree to the" GCPLA "because of unequal bargaining power, *as in an adhesion contract*." *D.R. Horton*, 120 Nev. At 554, 96 P.3d at 1162 (emphasis added by Nevada Supreme Court).

*4. Further investigation into *F.Q. Men's Club* reveals part of what was "unreasonably unfavorable to the more powerful party" was the exposure of the dancers to an unfair loss of funds. An indemnification provision created the possibility the employer could charge a "licensing house fee" or require "indemnification", requiring the dancers to pay unknown amounts to the employer in the future. The Nevada Supreme Court determined that clause was substantively unconscionable because it "benefits the drafting party at the other party's expense". *Id.* At 15. Here, for Mr. Maya, the loss of funds occurs when his lone claim goes to the black hole of arbitration. All the other CarMax auto technicians who are victims of wage theft are not helped. CarMax keeps their money.

Class action waivers are regularly ruled substantively unconscionable when they stand in the way of worker rights under federal labor law. *Totten v. Kellogg, Brown and Root, LLC,* 152 F. Supp.3d 1243, 1249 (C.D. Cal. 2016) In *Totten,* the court refused to enforce the FAA when it would impede a class action and thus workers' right under the Norris-LaGuardia Act to participate in concerted activities for mutual aid:

RAFII & ASSOCIATES, P.C.
EXCELLENCE | COMMITMENT | RESULTS

> Section 2 of the Norris–LaGuardia Act declares that it is the "public policy of the United States" that individual workers be free of "interference, restrain, or coercion" by employers when they engage in "concerted activities for the purpose of collective bargaining or *other mutual aid or protection* …." 29 U.S.C. § 102 (emphasis added).

The Norris-LaGuardia Act applies to Mr. Maya's class and collective action[24]; and *Totten* requires this Court to invalidate the class action waiver. Class action waivers are also substantively unconscionable when they attempt to force the employees to the "inferior forum" of arbitration. *Jackson v. S.A.W. Entertainment Ltd.*, 629 F.Supp.2d 1018, 1029-30 (N.D. Cal. 2009). The district court explained:

> First, the arbitration agreement contain[ed] more than one unlawful provision … [which] indicate[d] a systematic effort to impose arbitration on an employee not simply as an alternative to litigation, but as an inferior forum that works to the employer's advantage.

*Id.* It is worth pausing here. We are within the systematic oppression that concerned the court in *Jackson.* Any doubt that arbitration is an inferior forum for an employee must be dispelled. As commentators increasingly find, sending an employee to arbitration is the death knell of their claim:

> Perhaps the judicial proponents of mandatory arbitration still hold the view that arbitration entails a fair tradeoff, and allows for the effective vindication of employee rights. In light of what we now know about the sheer paucity of arbitrations, however, that view can no longer stand. If the Court continues on its current pro-arbitration path in the face of this stark reality, it will be complicit in employers' effective nullification of employee rights and protections.

Estlund *supra* n. 11 at 696.

**C. The Class and Collective Action Waiver Contravenes CarMax's implied warranty of good faith and fair dealing**

Eleven years ago in *Casas v. CarMax Auto Superstores California, LLC*, 224 Cal. App. 4th 1233 (2014), the California appellate court directly reminded CarMax that it had a duty of good

---

[24] If the "employer-employee relationship is the matrix" of the controversy, the Norris-LaGuardia Act applies. *Jacksonville Bulk Terminals Inc. v. International Longshoreman's Ass'n*, 457 U.S. 702, 714 (1982). Here the issue is payment of overtime and vacation days– central to the employer-employee relationship, -- which puts Mr. Maya firmly in the matrix.

faith in deploying the Dispute Resolution Agreement: "…the [arbitration] agreement also contains an implied covenant of good faith and fair dealing." (*citations omitted).* The *Casas* court was considering Rule 19 (unilateral amendment) and concluded that CarMax's obligation to act in good faith saved the agreement from unconscionability because under that obligation, they could not apply Rule 19 in an unfair way. *Id.* at 1238. CarMax has breached that duty of good faith. Under Nevada law, this breach prevents application of Rule 9(f)(ii):

> "Where the terms of a contract are literally complied with but one party to the contract deliberately countervenes the intention and spirit of the contract," that contravention may be a breach of the implied covenant of good faith and fair dealing.

*Saini v Int'l Games Tech,* 434 F.Supp.2d 913 (D. Nev 2006). "To establish a claim for breach of the implied covenant of good faith and fair dealing, a plaintiff must prove: (1) the existence of a contract between the parties; (2) that defendant breached its duty of good faith and fair dealing by acting in a manner unfaithful to the purpose of the contract; and (3) the plaintiff's justified expectations under the contract were denied." *Shaw v. CitiMortgage, Inc.*, 201 F.Supp.3d 1222, 1251 (D. Nev. 2016).

The purpose and intention -- the spirit -- of the Dispute Resolution Agreement, the document Mr. Maya did see and sign, is beautifully stated on its first page;

> *I recognize that differences may arise between CarMax and me during my application for employment with CarMax. I recognize that it is in the interest of both CarMax and me that disputes be resolved in a manner that is fair, private, expeditious, economical, final, and less burdensome or adversarial than court litigation.*

Dispute Resolution Agreement p. 1. That is the purpose. Later:

> *I understand that nothing in this Agreement is intended to affect or limit my rights under the National Labor Relations Act.*

*Id.* According to the National Labor Relations Board, Mr. Maya's rights under the National Labor Relations Act include "full freedom of association" for employees in their "right to seek better

RAFII & ASSOCIATES, P.C.
EXCELLENCE | COMMITMENT | RESULTS

RAFII & ASSOCIATES, P.C.
EXCELLENCE | COMMITMENT | RESULTS

working conditions and designation of representation without fear of retaliation."[25] These are Mr. Maya's "justified expectations".

The class and collective action waiver is therefore unenforceable because it "deliberately contravenes" the "intention and spirit" of the DRA two ways. First, it contravenes Mr. Maya's justified expectation of a "fair" and "economical" dispute resolution. Second, it limits Mr. Maya's "full freedom of association" to "seek better working conditions.". In short, the DRA – in words full of marketing and comfort *chosen by CarMax* - promised "fair", "economical" and "full freedom of association". CarMax already breached - by breaching its implied warranty of good faith and fair dealing – the DRA it seeks to enforce. No one can say with a straight face that confidential arbitration of an individual FLSA claim is fair and economical and allows full freedom of association to seek better working conditions. CarMax cannot be permitted to use the contract to further oppress Mr. Maya.

Fortunately, courts have been happy to edit the CarMax arbitration agreement when it stepped on the "full range of remedies" to which its ex-employees were entitled. In *Etokie v. CarMax Auto Superstores* 133 F. Supp. 2d 390, 395 (D. Md. 2000), the District Court in Maryland held that Rule 14 of the DRRP had to be modified in accordance with Rule 18 of the agreement. It explained that it had to do so to allow for:

> the full range of remedies that Plaintiff is entitled to under the ADA and Title VII. This solution conforms to the federal policy favoring arbitration, while ensuring that Plaintiff will have the opportunity to fully vindicate his rights.

(emphasis supplied). Mr. Maya seeks to have the whole arbitration agreement ruled unenforceable. In the alternative, Mr. Maya seeks the *Etokie* solution: ensuring that plaintiff will have the

---

[25] https://www.nlrb.gov/guidance/key-reference-materials/national-labor-relations-act

RAFII & ASSOCIATES, P.C.
EXCELLENCE | COMMITMENT | RESULTS

opportunity to vindicate his FLSA and class action rights by modifying the DRRP to drop Rule 9(g)(ii). In order to fully vindicate those rights, which is CarMax's duty of good faith to its employees, his claims must proceed as a class and collective action.

**D. The FLSA's Purpose Overrides the FAA's Mandate: Lucini v CarMax**

In *Lucini v CarMax,* 2012 WL 3862150, *6 (E.D. Cal.), the court held that the "FLSA does not override the strong FAA policy to enforce arbitration agreements" and their reasoning is a challenge:

> [P]laintiff "points to no suggestion in the text, legislative history, or purpose of the FLSA that Congress intended to confer a nonwaivable right to a class action under that statute. His inability to bring a class action, therefore, cannot by itself suffice to defeat the strong congressional preference for an arbitral forum"

*Id.* In truth, there was not a strong congressional preference to send that ten-year-old seamstress and "us girls" to individual arbitration. At the time Congress enacted the FAA, as a set out in the plain legislative history of the FAA[26], it was intended to apply to exactly zero worker agreements:

> The legislative history demonstrating that Congress intended to exclude all workers' contracts from the FAA was not ambiguous. In fact, Justice O'Connor, in her dissent in another controversial Supreme Court decision, *Southland Corp. v. Keating*, 465 U.S. 1, 25 (1984) said "[o]ne rarely finds a legislative history as unambiguous as the FAA's." Yet, the Supreme Court in *Circuit City* freely and deliberately ignored legislative history and the appropriate 1925 view of the Commerce Clause in order to give the FAA a meaning the 1925 Congress never intended and worked hard to avoid.

Margaret L. Moses, *supra* n.15 at 436.

There is however strong legislative history showing the 'underlying purpose' of the FLSA was to protect workers like Mr. Maya.[27] All relevant circumstances demonstrate that the idea that

---

[26] *See supra* n. 9.

[27] John S. Forsythe, *Legislative History of the Fair Labor Standards Act*, 6 Law & Contemporary Problems 464, 465-66, 484 (1939) (scholarship.law.duke.edu) ("The President's message to Congress asserted the necessity for governmental control over maximum hours, minimum wages, the evil of child labor and *the exploitation of unorganized labor*). *See also Hoffman-LaRoche v Sperling,* 493 U.S. 165, 173 (1989) ("In 1938, Congress gave employees and their "representatives" the right to bring actions to recover amounts due under the FLSA.")

RAFII & ASSOCIATES, P.C.
EXCELLENCE | COMMITMENT | RESULTS

workers will have their FLSA claims vindicated is absolutely incorrect. Ninety-eight per cent of the claims are never brought. What was true in 1924 is exponentially magnified one hundred years later:

> In fact, for many years commentators have warned that arbitration is becoming prohibitively expensive. Furthermore, arbitral proceedings are confidential, and arbitrators are not required to issue written opinions. While secrecy may protect businesses from unpleasant public relations scandals, it also may keep wrongdoing from being publicized and therefore deterred. Arbitrators and their decisions are shielded from judicial oversight…. At the same time, arbitrators are subject to incentives that may cause them to favor repeat players. An arbitrator's income hinges on her being selected as an arbitrator; should she decide against a repeat player, she may permanently lose that player's business.

Testimony of Charles Bernheimer, Arbitration of Interstate Commercial Disputes: Hearing of S. 1005 and H.R. 646 Before the J. Comm. of Subcomms. on the Judiciary, 68th Cong. 16, 37 (1924) at 3, 7. *See also* Estlund and Colvin, *infra* n.11.

The FAA was not enacted twelve years *before* the FLSA so that employers could foreclose valid FLSA collective claims through mandated arbitration. Therefore, it cannot override the FLSA purpose: "to regulate the conduct of employers *for the benefit of employees*." *See v. Employer Solutions Staffing Group, LLC*, 951 F.3d 1097, 1102 (9th Cir. 2020) (emphasis supplied). Mr. Maya has met the *Lucini* challenge and has given ample evidence to allow this Court to rule in his favor, allowing the class and collective to proceed in either court or arbitration.[28]

**E. Sanctions Demands Brought In Bad Faith Should Be Denied.**

Under the FAA, Mr. Maya has every right to challenge the formation, unconscionability, and breach of implied warranty of good faith and fair dealing in the DRA and DRRP and his attorney has an obligation to pursue that right diligently. *See, e.g., Ronderos.* CarMax's heavy-

---

[28] Further, Plaintiffs oppose Defendants' motion to stay. A stay is an "extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it". *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 14 (S.Ct. 1983). A stay must therefore be declined unless the movant demonstrates "exceptional circumstances." *Id.* at 46. Defendants have not.

handed strategy of sanctioning any ex-employee who seeks enforcement of laws protecting them is oppressive, unwarranted and in the cases CarMax cited, unsuccessful. *See CarMax Auto Superstores, Inc. v. Sibley*, 767 Fed. App. 462 (4th Cir. 2019). In *Sibley,* the Fourth Circuit permitted some sanctions only when the plaintiff "ignored the district court's finding that his argument was meritless and its warning that it would not tolerate vexatious litigation tactics." *Id.* at 464. There is no district court warning here. More importantly, in *Sibley,* the Fourth Circuit *set aside* sanctions: "the district court *did abuse its discretion in awarding sanctions* based on Sibley's claims that the class action arbitration waiver violated the NLRA and that the confidentiality provisions were unconscionable". *Id. 464-465.* The Fourth Circuit admonished CarMax that its ex-employee "has a right to come to court seeking to obtain a different result." *Id.* at 465. Mr. Maya is another ex-employee with the same right.

CarMax cites *Schutts v. Bentley Nevada Corp.,* 966 F. Supp. 1549, 1558–61 (D. Nev. 1997) in support of sanctions. In *Schutts,* however, the sanctioned plaintiff was given due process (safe harbor) when defendant warned plaintiff that they were likely to seek sanctions prior to doing so. *Id.* at 1562. No such courtesy was afforded to Mr. Maya's Counsel. Mr. Maya's Counsel asked CarMax Counsel why they wanted to discuss precedent. Exhibit B to Def.'s Hernandez Decl. If CarMax had said it was planning to seek sanctions, Mr. Maya's counsel would have shared *Ronderos* and *Osterhaus,* 2024 cases in which arbitration agreements were found unconscionable and therefore unenforceable under the FAA. Mariner Decl. ¶ 11-12. Indeed, Plaintiff's counsel would have enthusiastically discussed them at length, working in "*I wish you could do something to help us girls*". *Id.* CarMax's counsel did not respond to Mr. Maya's counsel's question as to *why* they wanted to discuss precedent. CarMax simply filed a motion for sanctions. CarMax counsel cannot be rewarded with sanctions against its humble ex-mechanic or his counsel when CarMax



RAFII & ASSOCIATES, P.C.
EXCELLENCE | COMMITMENT | RESULTS

RAFII & ASSOCIATES, P.C.
EXCELLENCE | COMMITMENT | RESULTS

deliberately failed to provide safe harbor. Sadly, this action reflects the substance of the DRRP and the hiding of the class and collective waiver: bad faith. Sanctions cannot be awarded.[29]

Finally, because at the time that the sanctions had been requested, only the Complaint had been filed by Mr. Maya, CarMax seeks to sanction Plaintiff for filing the Complaint. Under 28 U.S.C. §1927, however, complaints are not sanctionable. The 9th Circuit explains:

> We have twice expressly held that § 1927 cannot be applied to an initial pleading. *See Zaldivar,* 780 F.2d at 831 (under § 1927, "the *multiplication* of proceedings is punished, thus placing *initial* pleadings beyond" the section's reach) (emphasis in original); *Matter of Yagman,* 796 F.2d 1165, 1187 (9th Cir.) ("Section 1927 does not apply to initial pleadings, since it addresses only the multiplication of proceedings. It is only possible to multiply or prolong proceedings after the complaint is filed."), *amended,* 803 F.2d 1085 (9th Cir.1986)

*In re Keegan Management Co., Securities Litigation*, 78 F.3d 431, 435 (9th Cir. 1996)

## VI. CONCLUSION

For the foregoing reasons, Plaintiffs request that this Court deny Defendants' Motion to Compel, Stay and Grant Attorneys' Fees and allow Mr. Maya to proceed in court. In the alternative, Plaintiff requests for the reasons stated herein that the Class and Collective Action Waiver hidden in Rule 9(g)(ii) be stricken from the DPPA as it contravenes CarMax's implied warranty of good faith and fair dealing. Plaintiff could proceed in class and collective arbitration of his and his brother and sister employee claims.

DATED: January 21, 2025

**RAFII & ASSOCIATES, P.C.**

*/s/ Rachel Mariner*
RACHEL MARINER
*Attorney for Plaintiffs*

---

[29] The other two cases cited by CarMax in support of attorneys' fees are curious. One supports Mr. Maya in that *attorneys' fees are not awarded* (*United Food & Commercial Workers Union, Locals 197 et al*. *v. Alpha Beta Co*., 736 F.2d 1371 (9th Cir. 1984) ("…although a number of Alpha Beta's arguments are "frivolous," its principal argument, that the disputed provision is unlawful, is not. We therefore hold that this appeal does not justify an award of fees")). In the other, fees are awarded to *both* parties. *Hubbard v Yardage Town, Inc.* 2005 WL 3388146 (S.D. Cal.).